**EXHIBIT E**

Precision Billing LLC • 80 West Madison Avenue • Dumont, NJ 07628 • (201) 501-8500

Date: 01-26-2011

Horizon BC/BS
PO Box 199
Newark, NJ 07101

Patient: ███████████████

DOB: ████████

ID: ████████████████

Practice: HealthSwitch LLC

Treating Provider: Philip C Agrios DC

Enclosed you will find claim forms that are being resubmitted as an appeal for processing.

**These claims are not duplicate.** The enclosed are:

_____         corrected claims

_____         being refiled to correct an error in processing.

_____         sent with progress notes to establish medical necessity.

___X___         Other: Spinal Manipulation under anesthesia and all other manipulations under anesthesia or not experimental and investigational.  An experimental procedure is very easily addressed in the AMA CPT codebook of reimbursable procedures, in the introduction to that publication.  In order for a procedure to be included in the AMA CPT codebook of reimbursable procedures, it must first have undergone clinical validation by being used by same or similar practitioners for the same or similar conditions. It must then go through the review process by an 11-member panel that evaluates the outcomes of the procedure used by same or similar practitioners; the review panel then makes a recommendation that the procedure be included within the proper section of the codebook. This is then part of a recommendation review for publication in the codebook, and the procedure does not appear in this book unless it passes all of these reviews and evaluations.

According to an April 2004 letter from the AMA regarding CPT code 22505, in response to Dr. Daniel West's (an advisory member of the National Academy of MUA Physicians) request for clarification of this procedure, the following is required of the CPT Advisory Committees and the CPT Editorial Panel for CPT publication as a category 1 procedure (which is what 22505 is listed as):

7010 1670 0002 4565 5450

Precision Billing LLC  •  80 West Madison Avenue  •  Dumont, NJ 07628  •  (201) 501-8500

"That the service/procedure has received approval from the Food and Drug Administration (FDA) for the specific use of the device or drug;

"That the suggested procedure/service is a distinct service performed by many physicians/practitioners across the United States;

"That the clinical efficacy of the service/procedure is well established and documented in the United States per review literature;

"That the suggested service/procedure is neither a fragmentation of an existing procedure/service nor currently reportable by one or more existing codes; and

"That the suggested service/procedure is not requested as a means to report extraordinary circumstances related to the performance of a procedure/service already having a specific CPT code.

"Therefore, based upon the above information and in response to your specific question, Category 1 codes do not represent experimental or emerging technology"

An experimental procedure is very easily addressed in the AMA CPT codebook of reimbursable procedures, in the introduction to that publication. In order for a procedure to be included in the AMA CPT codebook of reimbursable procedures, it must first have undergone clinical validation by being used by same or similar practitioners for the same or similar conditions. It must then go through the review process by an 11-member panel that evaluates the outcomes of the procedure used by same or similar practitioners; the review panel then makes a recommendation that the procedure be included within the proper section of the codebook. This is then part of a recommendation review for publication in the codebook, and the procedure does not appear in this book unless it passes all of these reviews and evaluations.

Therefore, please reprocess claims in according with the 2004 AMA recommendation regarding Manipulation under Anesthesia accordingly.  FIRST LEVEL APPEAL

Thank you for your prompt attention.

Sincerely,

Kelly J. Langschultz
Billing Specialist

621028.100265

# Precision Billing™
## & CONSULTING SERVICES, LLC

01/26/2011

**VIA CERTIFIED MAIL/RRR**

Horizon
PO Box 190
Newark NJ 07101

Re: **Request for Experimental Procedure Policies/Plan Documents**
   Patient Name: _____
   Benefit Plan: ___ Horizon
   Dates of Service: 3/30/10, 3/31/10, 4/1/10

Dear Sir/Madam:

Please accept this letter as notification of our authorization as representative to act on behalf of _____ in the above-referenced adverse benefit determinations. Attached is a copy of the authorization for your records.

This letter is also a request for additional information. It is our understanding that the above-referenced claim was denied pursuant to a plan exclusion related to experimental/investigational treatments. The denial/explanation of benefits, however, did not give adequate information to establish the accuracy of this decision.

Thus, we hereby request the following information to support the denial of benefits for this treatment: (1) a copy of the experimental/investigation treatment limitation in the plan or policy as well as any related definitions; (2) if internal clinical guidelines were utilized and/or are applicable, please provide a copy of each such clinical guidelines as well as the name and credentials of the medical professional who reviewed the treatment records; (3) an outline of the specific records reviewed and a description of any records which would be necessary in order to approve the treatment; and (4) copies of any expert medical opinions reviewed by your company in regards to treatment of this nature and its efficacy so that the treating provider may respond o its applicability to this particular patient's condition.

As you are likely aware, both state and federal disclosure laws as well as plan terms may be applicable and require the release of detailed information to substantiate

621028.100295

an adverse benefit determination.  If you believe this request does not fall under said disclosure requirements, please provide a written explanation.

Finally, we hereby request on behalf of our patients a copy of the Summary Plan Description ("SPD") required to be maintained by the Plan and provided upon request to the Plan Beneficiary under ERISA.  Please note, an enrollee/beneficiary may file suit against a Plan Administrator who fails to comply with the enrollee's/beneficiary's request for a copy of the latest SPD.  Indeed, Section 502(a)(1)(A) of ERISA indicates the Plan Administrator has thirty (30) days to provide the SPD to the enrollee/beneficiary.  The Plan Administrator may be held liable for up to $110.00 per day for each day it fails to provide the SPD to the enrollee/beneficiary.

Thank you for your cooperation.  We look forward to receiving the requested materials and pursuing the appeal of the adverse benefit determinations.

Respectfully yours,


Kelly J. Langschultz
Director

621028 108295

# *Precision* ❤ *Billing*™
## & CONSULTING SERVICES, LLC

Date: **01·26·2011**

Practice: **Health Switch LLC**

Tax Id: **264468049**

Plan Administrator: **Horizon**

Plan Sponsor: **Employer**

Address: **PO Box 199**

Address: **Newark NJ 0710l**

Re:  Request for █████████████████ summary plan description

Patient Name: ████████████████

ID Number: █████████████████

DOB: ████████████

Dear Plan Administrator:

Enclosed please find a Designation of Authorized Representative signed by my patient in accordance with the requirements of the employee retirement income security act of 1974 (ERISA). I have also enclosed an Assignment of benefits to assure that payment is made directly to this office in accordance with the desires of my patient.

The enclosed Designation of Authorized Representative permits **Health Switch LLC** to pursue the rights granted to my patient under ERISA law. Those rights include:

- Receiving notice regarding inquiries with respect to the determination of claims both pre and post service

- Receiving a description and copies of documents of all claims procedures (including any procedures for obtaining prior approval as a prerequisite for obtaining a benefit, such as

preauthorization procedures or utilization review procedures) and the applicable time frames as set forth in the summary plan description.

- Obtaining a copy of the summary plan description

- Pursuing appeals of plan adverse decisions, to take legal action in any forum, including the courts, and to obtain all information from the plan that the claimant is entitled in order to pursue appeals:

- Taking all action permitted under applicable statutes and rules as authorized representative of my patient.

Accordingly, please provide this office with a copy of the summary plan description.  Thank you for your compliance with the legal requirements.  Please fax the summary plan description to 201-501-8523 or mail a copy to Precision Billing, LLC, Attn:  Kelly J. Langschultz, 80 West Madison Avenue, Dumont, NJ 07628.

Sincerely,


Kelly J. Langschultz

Billing Supervisor

**HEALTH INSURANCE CLAIM FORM**

1500

**Unless this claim is paid or denied within 30 days, we will file a formal complaint with the Insurance**

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE 08/05

G2L 22099 HORIZON.GS
PO BOX 820
NEWARK NJ 07101

PICA

PICA

| 1. MEDICARE | MEDICAID | TRICARE CHAMPUS | CHAMPVA | GROUP HEALTH PLAN | FECA BLK LUNG | OTHER | 1a. INSURED'S ID NUMBER (For Program in Item 1) |
|---|---|---|---|---|---|---|---|

(Medicare #) (Medicaid #) (Sponsor's SSN) (Member ID#) (SSN or ID) (SSN) [X] (ID)

2. PATIENT'S NAME (Last Name, First Name, Middle Initial)

3. PATIENT'S BIRTH DATE MM DD YY    SEX

4. INSURED'S NAME (Last Name, First Name, Middle Initial)

5. PATIENT'S ADDRESS (No., Street)

6. PATIENT RELATIONSHIP TO INSURED
Self [X]  Spouse [ ]  Child [ ]  Other [ ]

7. INSURED'S ADDRESS (No., Street)

CITY                                STATE

8. PATIENT STATUS
Single [ ]  Married [ ]  Other [ ]
Employed [ ]  Full-Time Student [ ]  Part-Time Student [ ]

CITY                                STATE

ZIP CODE        TELEPHONE (Include Area Code)

ZIP CODE        TELEPHONE (Include Area Code)

9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial)

10. IS PATIENT'S CONDITION RELATED TO:

11. INSURED'S POLICY GROUP OR FECA NUMBER
NONE

a. OTHER INSURED'S POLICY OR GROUP NUMBER

a. EMPLOYMENT? (Current or Previous)
YES [ ]  NO [X]

a. INSURED'S DATE OF BIRTH MM DD YY    SEX
M [ ]  F [ ]

b. OTHER INSURED'S DATE OF BIRTH MM DD YY    SEX
M [ ]  F [ ]

b. AUTO ACCIDENT?
YES [ ]  NO [X]    PLACE (State)

b. EMPLOYER'S NAME OR SCHOOL NAME

c. EMPLOYER'S NAME OR SCHOOL NAME

c. OTHER ACCIDENT?
YES [ ]  NO [X]

c. INSURANCE PLAN NAME OR PROGRAM NAME

d. INSURANCE PLAN NAME OR PROGRAM NAME

10d. RESERVED FOR LOCAL USE

d. IS THERE ANOTHER HEALTH BENEFIT PLAN?
YES [ ]  NO [X]    If yes, return to and complete item 9 a-d.

READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.

12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED  SIGNATURE ON FILE    DATE 03/30/10

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED  SIGNATURE ON FILE

14. DATE OF CURRENT: MM DD YY  [ ] ILLNESS (First symptom) OR INJURY (Accident) OR PREGNANCY (LMP)
03 30 2010

15. IF PATIENT HAS HAD SAME OR SIMILAR ILLNESS. GIVE FIRST DATE MM DD YY

16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION
FROM  TO

17. NAME OF REFERRING PROVIDER OR OTHER SOURCE

17a.
17b. NPI

18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES MM DD YY  MM DD YY
FROM  TO

19. RESERVED FOR LOCAL USE

20. OUTSIDE LAB?   $ CHARGES
YES [ ]  NO [X]

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY (Relate Items 1, 2, 3 or 4 to Item 24E by Line)

1. 726 0          3. 733 0

2. 726 10         4. 847 1

22. MEDICAID RESUBMISSION CODE    ORIGINAL REF. NO.

23. PRIOR AUTHORIZATION NUMBER

| 24. A. DATE(S) OF SERVICE From MM DD YY | To MM DD YY | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS | MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID QUAL | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 03 30 10 | 03 30 10 | 24 | | 23700 | 62 50 | 1 2 3 4 | 1400 00 | 1 | | NPI | 1770703860 |
| 03 30 10 | 03 30 10 | 24 | | 22505 | 62 | 1 2 3 4 | 2200 00 | 1 | | NPI | 1770703860 |
| 03 31 10 | 03 31 10 | 24 | | 23700 | 62 50 | 1 2 3 4 | 1400 00 | 1 | | NPI | 1770703860 |
| 03 31 10 | 03 31 10 | 24 | | 22505 | 62 | 1 2 3 4 | 2200 00 | 1 | | NPI | 1770703860 |
| 04 01 10 | 04 01 10 | 24 | | 23700 | 62 50 | 1 2 3 4 | 1400 00 | 1 | | NPI | 1770703860 |
| 04 01 10 | 04 01 10 | 24 | | 22505 | 62 | 1 2 3 4 | 2200 00 | 1 | | NPI | 1770703860 |

25. FEDERAL TAX I.D. NUMBER    SSN  EIN
264468049   [X]

26. PATIENT'S ACCOUNT NO.
COVID100

27. ACCEPT ASSIGNMENT?
YES [X]  NO [ ]

28. TOTAL CHARGE
$ 10800.00

29. AMOUNT PAID
$

30. BALANCE DUE
$ 10800.00

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)

PHILIP C. AGRIOS DC
SIGNED  05/05/10

32. SERVICE FACILITY LOCATION INFORMATION
MONTVALE SURGICAL CENTER
6 CHESTNUT RIDGE ROAD
MONTVALE NJ 07645
a. 1659513067

33. BILLING PROVIDER INFO & PH # ( 732 ) 5285533
PHILIP C AGRIOS DC
2399 ROUTE 34
WALL TOWNSHIP NJ 08736
a. 1659513067

NUCC Instruction Manual available at: www.nucc.org

PLEASE PRINT OR TYPE

APPROVED OMB-0938-0999 FORM CMS-1500 (08-05)

Mfd. by Medical Arts Press
Call toll-free: 1-800-328-2179

#14710 - Medical Arts Press
Use with Envelope #14145 (gummed) or

**BECAUSE THIS FORM IS USED BY VARIOUS GOVERNMENT AND PRIVATE HEALTH PROGRAMS, SEE SEPARATE INSTRUCTIONS ISSUED BY APPLICABLE PROGRAMS.**

**NOTICE:** Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

### REFERS TO GOVERNMENT PROGRAMS ONLY

**MEDICARE AND CHAMPUS PAYMENTS** A patient's signature requests that payment be made and authorizes release of any information necessary to process the claim and certifies that the information provided in Blocks 1 through 12 is true, accurate and complete. In the case of a Medicare claim, the patient's signature authorizes any entity to release to Medicare medical and nonmedical information, including employment status, and whether the person has employer group health insurance, liability, no-fault, workers' compensation or other insurance which is responsible to pay for the services for which the Medicare claim is made. See 42 CFR 411.24(a). If item 9 is completed, the patient's signature authorizes release of the information to the health plan or agency shown. In Medicare assigned or CHAMPUS participation cases, the physician agrees to accept the charge determination of the Medicare carrier or CHAMPUS fiscal intermediary as the full charge, and the patient is responsible only for the deductible, coinsurance and noncovered services. Coinsurance and the deductible are based upon the charge determination of the Medicare carrier or CHAMPUS fiscal intermediary if this is less than the charge submitted. CHAMPUS is not a health insurance program but makes payment for health benefits provided through certain affiliations with the Uniformed Services. Information on the patient's sponsor should be provided in those items captioned in 'Insured', i.e., items 1a, 4, 6, 7, 9 and 11.

### BLACK LUNG AND FECA CLAIMS

The provider agrees to accept the amount paid by the Government as payment in full. See Black Lung and FECA instructions regarding required procedure and diagnosis coding systems.

### SIGNATURE OF PHYSICIAN OR SUPPLIER (MEDICARE, CHAMPUS, FECA AND BLACK LUNG)

I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.

For services to be considered as "incident" to a physician's professional service, 1) they must be rendered under the physician's immediate personal supervision by his/her employee, 2) they must be an integral, although incidental part of a covered physician's service 3) they must be of kinds commonly furnished in physician's offices, and 4) the services of nonphysicians must be included on the physician's bills.

For CHAMPUS claims, I further certify that I (or any employee) who rendered services am not an active duty member of the Uniformed Services or a civilian employee of the United States Government or a contract employee of the United States Government, either civilian or military (refer to 5 USC 5536). For Black-Lung claims, I further certify that the services performed were for a Black Lung-related disorder.

No Part B Medicare benefits may be paid unless this form is received as required by existing law and regulations (42 CFR 424.32).

**NOTICE:** Any one who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

### NOTICE TO PATIENT ABOUT THE COLLECTION AND USE OF MEDICARE, CHAMPUS, FECA, AND BLACK LUNG INFORMATION
### (PRIVACY ACT STATEMENT)

We are authorized by CMS, CHAMPUS and OWCP to ask you for information needed in the administration of the Medicare, CHAMPUS, FECA, and Black Lung programs. Authority to collect information is in section 205(a), 1862, 1872 and 1874 of the Social Security Act as amended, 42 CFR 411.24(a) and 424.5(a) (6), and 44 USC 3101(41 CFR 101 et seq and 10 USC 1079 and 1086; 5 USC 8101 et seq; and 30 USC 901 et seq; 38 USC 613; E.O. 9397

The information we obtain to complete claims under these programs is used to identify you and to determine your eligibility. It is also used to decide if the services and supplies you received are covered by these programs and to insure that proper payment is made.

The information may also be given to other providers of services, carriers, intermediaries, medical review boards, health plans, and other organizations or Federal agencies, for the effective administration of Federal provisions that require other third parties payers to pay primary to Federal program, and as otherwise necessary to administer these programs. For example, it may be necessary to disclose information about the benefits you have used to a hospital or doctor. Additional disclosures are made through routine uses for information contained in systems of records

FOR MEDICARE CLAIMS: See the notice modifying system No. 09-70-0501, titled, 'Carrier Medicare Claims Record,' published in the *Federal Register*, Vol. 55 No. 177, page 37549, Wed. Sept. 12, 1990, or as updated and republished.

FOR OWCP CLAIMS: Department of Labor, Privacy Act of 1974, "Republication of Notice of Systems of Records," *Federal Register* Vol. 55 No. 40, Wed Feb. 28, 1990. See ESA-5, ESA-6, ESA-12, ESA-13, ESA-30, or as updated and republished.

FOR CHAMPUS CLAIMS: <u>PRINCIPLE PURPOSE(S):</u> To evaluate eligibility for medical care provided by civilian sources and to issue payment upon establishment of eligibility and determination that the services/supplies received are authorized by law.

ROUTINE USE(S): Information from claims and related documents may be given to the Dept. of Veterans Affairs, the Dept. of Health and Human Services and/or the Dept. of Transportation consistent with their statutory administrative responsibilities under CHAMPUS/CHAMPVA; to the Dept. of Justice for representation of the Secretary of Defense in civil actions; to the Internal Revenue Service, private collection agencies, and consumer reporting agencies in connection with recoupment claims; and to Congressional Offices in response to inquiries made at the request of the person to whom a record pertains. Appropriate disclosures may be made to other federal, state, local, foreign government agencies, private business entities and individual providers of care on matters relating to entitlement, claims adjudication, fraud, program abuse, utilization review, quality assurance, peer review, program integrity, third-party liability, coordination of benefits, and civil and criminal litigation related to the operation of CHAMPUS.

DISCLOSURES: Voluntary; however, failure to provide information will result in delay in payment or may result in denial of claim. With the one exception discussed below, there are no penalties under these programs for refusing to supply information. However, failure to furnish information regarding the medical services rendered or the amount charged would prevent payment of claims under these programs. Failure to furnish any other information, such as name or claim number, would delay payment of the claim. Failure to provide medical information under FECA could be deemed an obstruction.

It is mandatory that you tell us if you know that another party is responsible for paying for your treatment. Section 1128B of the Social Security Act and 31 USC 3801-3812 provide penalties for withholding this information.

You should be aware that P.L. 100-503 the "Computer Matching and Privacy Protection Act of 1988" permits the government to verify information by way of computer matches.

### MEDICAID PAYMENTS (PROVIDER CERTIFICATION)

I hereby agree to keep such records as are necessary to disclose fully the extent of services provided to individuals under the State's Title XIX plan and to furnish information regarding any payments claimed for providing such services as the State Agency or Dept. of Health and Human Services may request.

I further agree to accept as payment in full the amount paid by the Medicaid program for those claims submitted for payment under that program, with the exception of authorized deductible, coinsurance, co-payment or similar cost-sharing charge.

SIGNATURE OF PHYSICIAN (OR SUPPLIER): I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction.

NOTICE: This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws.

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-0999. The time required to complete this information collection is estimated to average 10 minutes per response, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection. If you have any comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, Attn: PRA Report, C-4-26-05 7500 Security Boulevard, Baltimore, Maryland 21244-1850. This address is for comments and/or suggestions only. DO NOT MAIL COMPLETED CLAIM FORMS TO THIS ADDRESS

04/03/2010 11:56   Montvale Rehab & Spinal Care Cntr 201 391 0295   P 003.004

## Montvale Surgical Center

Surgeon

Co-Surgeon

MRN:
DOB: 04/01/10
DOS:
DR: LAMBERT, RICK

## MUA SUPER BILL SUMMARY PROCEDURE

| | SPINE | HIP | PELVIS | SHOULDER | ELBOW | WRIST | HAND | KNEE | ANKLE |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 22505 | 27275 | 27194 | 23700 | 24300 | 23259 | 21073 | 27570 | 27860 |
| 2 | 22505 | 27275 | 27194 | 23700 | 24300 | 23259 | 21073 | 27570 | 27860 |
| 3 | 22505 | 27275 | 27194 | 23700 | 24300 | 23259 | 21073 | 27570 | 27860 |
| 4 | 22505 | 27275 | 27194 | 23700 | 24300 | 23259 | 21073 | 27570 | 27860 |
| 5 | 22505 | 27275 | 27194 | 23700 | 24300 | 23259 | 21073 | 27570 | 27860 |
| 6 | 22505 | 27275 | 27194 | 23700 | 24300 | 23259 | 21073 | 27570 | 27860 |

## DIAGNOSIS

| | SITE | PRIMARY Dx | SECONDARY Dx | TERTIARY Dx | QUADINARY Dx |
|---|---|---|---|---|---|
| 1 | (R) Shoulder | 726.0 | 726.10 | 718.41 | 718.51 |
| 2 | (L) Shoulder | 726.0 | 726.10 | 718.41 | 718.51 |
| 3 | C-SPINE | 847.0 | 723.0 | — | — |
| 4 | T-SPINE | 847.1 | 739.1 | — | — |
| 5 | | | | | |
| 6 | | | | | |



04/07/2010   10:12   KX5050                                    FAX:920139147   P.005





04/07/2010   10:12   KX5050                    (FAX)2013844701              P.008

3/24/2010

Doctor: Dr. Dr Philip C. Agrios
Mailing List Code:
Home Phone Nbr:                                    Work Phone:
Date Of Birth:                                     Cell Phone:
Gender:                                            SSNbr:
Type Of Patient: S - Standard Group Health / Single or Co_Insu
Date Of Accident Or Illness:                       Balance Due: $3,530.00
Date First Consulted: 1/21/2010                    Date Of Last Bill:
Date Of Same Or Similar Illness:                   Amount of Last Bill:
Tot Disability Began:                              Date Of Last Payment: 3/3/2010
Tot Disability Ended:                             Paid Since Last Billed: $320.00
Par Disability Began:                              Paid This Year: $320.00
Par Disability Ended:                             Nbr Visits Since X-Ray:
Date Of Very First Visit: 1/21/2010                        Status: Active
Date Of Very Last Visit: 3/3/2010
Date Of Last X-Ray:
Total Nbr Of Visits This Year: 12
Nbr Of Other Referred This YR:
Total Nbr of Others Referred:
DIAGNOSIS:

· · · · · · · · · · · · · · · · · · · · · · I N S U R A N C E · · · · · · · · · · · · · · · · · · · · · · · ·

#7    HORIZON BCBS OF NJ (PRIMARY)              Authorization:
      PO BOX 820                                EffectiveDate: 11/15/2009
      NEWARK, NJ 07101-0820                     Expiration Date:
Phone:              Fax:                         Co-Pay Amount: $35        Co Pay %: 3000
· · · Insured's Information · · · · · · · · ·       Deductable: $2,500.00      Paid:
     Name:                                          Visits Allowed: 30        Used: 2
     Address:                                        Amt Allowed:             Used: $0.00
     City ST ZIP:
Grp / Pol Nbr:                   Empl/SCH:
     ID#:
Relation: SELF                   DOB:

04/07/2010   10:13   KX5050                                    G21 FAX 2013870205          P.008

## In-Balance Health LLC
### 8 Chestnut Ridge Road
### Montvale NJ 07645
### Rick Lambert MD

### Patient Consultation Note

3 -25- 10
Date of service                              Patient Name

_____          _____          _____
Social Security #                   DOB                      Ins. ID Number

### Chief Complaint

1. ®shoulder ⊕ 3/10 at rest ⊏ ⊕ meds. ⊕↑ ⁊₁₀
after a day of "normal use" (ie) computer, light
lifting (no over head lifting).

2. ⊕ shoulder ⊕ 1/10 ⟹ 10/10 - r.o.m is more
restricted tha ®.

3. Neck ⊕ 6/10 - aggravated by ® shoulder
⊕

4. ⊕ between shoulder blade. 6.8/10

04/07/2010   10:13   KX5050

consultation con't

3-25-10

## History of Chief Complaint

1. ®shoulder ⊕ + year hx of recurring frozen shoulder s/p arthroscopy.
   - multiple Tr.Pt injections

2. ⊕ shoulder ⊕ + year hx of recurring frozen shoulder.
   - s/p open surgery
   - s/p m.u.a
   - s/p multiple T.Pt injections.

3 C.S.C.
   - Chronic progressive DDD c̄ facet syndrome ⊕ 6 years.
   - s/p multiple ℗ procedures to C-S.C

04/07/2010   10:13   KX5050                            S 1 (FAX)2013314703 2 G 5      P.010

consultation con't   2 - 25 ·10

## Review of Medical Records

EVALUATION : DR. Agrios    2-17-10
- Cervical brachial syndrome
- Shoulder impingement
- Lumber subluxation
- Muscle spasm
- osteopathy of hip
- thoracic subluxation

MRI  C-SP   7-1-08
- C3/4  HNP c̄ ⓁR narrow foramen impingt
- C6-7  DISCOPATHY
- C4/5  C5/6   DIFFUSE  A.D.  DDD

MRI - L-SP   7-1-08
- L4/5   DISCOPATHY
- L5/S1        ''
-

Rx  Dr. Phil Pollen  MD    PM E F / ⓅR MMG
    for  MUA  C-SP, T-SP  &̄ ⓁR shoulders

04/07/2010   10:14  KX5050                                    G 2 ī (FAX)20130147012 75   P.011

MUA consultation con't

3·25·70

**III. Review of Systems:** other than the symptoms associated with the present events, the following is reported with regard to recent health:

General:      (-) fever        (-) weight loss         (-) fatigue

HEENT:        (+) congestion      (-) headaches       (-) visual problems         (-) sore throat

Cardiovascular:     (-) chest pain        (-) claudication      (-) palpitations

Pulmonary:           (-) cough          (-) dyspnea          (-) ankle edema

GI:   (-) abdominal pain        (-) n/v        (-) diarrhea           (-) constipation         (-) bleeding

GU:   (-) dysuria          (-) hematuria

Neuro:      (-) localized weakness          (-) memory loss          (-) numbness

Musculoskeletal:     (+) joint pain        (+) stiffness          (-) joint swelling

Psychiatric:       (+) emotional stress       (+) depression        (+) anxiety          (+) insomnia

IV. Past Medical History:
(-) diabetes        (-) HTN        (-) asthma         (-) hypercholesterolemia       (-) heart disease

Surgical History:        (+) prior surgeries

MUA consultation con't

3·25·10

V. Medications   Laxapro
                 Linexin
                 Soma
                 Oxycontin
                 Wellbutrin

VI. Allergies    NKDA

VII. Family History   (-) diabetes   (-) HTN   (-) heart dx   (-) cancer
                      e

VIII. Psycho-Social/History

Work Status        (Employed) Disabled  Tempomry  Permanent  Partial  Total

Job Description:   Operation mgr. — attorney

Marital Status     Single  (Married)  Divorced  Separated  Widowed

Children           (None) 1  2  3  4  5

Smoking History    (Non-smoker)        Half pack      Full pack      Two packs

Alcohol            None    Social    Other    @ wine @ mg/d

Drug use           (None)              Other

A.D.L              works through pain
                   difficulty playing golfer exercising

04/07/2010   10:15  KX5050                                    (FAX)                              P.013

MUA consultation con't

3-25-10

## IX. Medical Examination:

| 5'5½" | 144 | | |
|-------|-----|--------|-----|
| Height | Weight | Gender | Age |

General Appearance:  (well developed),  (well nourished)

Vital signs:   BP  130/84       HR   70         RR   12

Skin:      Warm, Dry        (-) cyanosis   (-) jaundice   (-) rash

WNL

HEENT:   (-) conjunctival pallor      (-) scleral icterus      (-) pharyngeal erythema

WNL

Neck:   (-) thyromegaly    (-) bruits    (-) lymphadenopathy    (-) other masses

WNL

Heart:   (-) murmur     (-) irregularity     (-) gallop

WNL

Chest:   (-) rales     (-) rhonchi      (-) wheezes;
          breath sounds equal bilaterally

WNL

Abdomen:   (-) tenderness     (-) palpable masses    (-) CVA tenderness

WNL

04/07/2010   10:15   KX5050                         FAX 2013914707         P.014

consultation con't

3-25-10

## Examination of the Cervical & Thoracic Spine

**Observation:** _Elevation (R) shoulder_

**Palpation:** _____

**Myofascial Trigger Points**

_(R) AC joints very tender (L) Bic. Groove. (R) Supraspinatus._
_(L) Subscapularis (L) Lev. Scap & paraspinals_
_(B) Rhomboids · contracture (L) - spasm / tender (R)_

### Range of Motion of the Cervical Spine

Forward Flexion   _40/90_   Right Side Flex _20_/45   right rotation   _45°_/90
Extension         _35_/70   Left Side Flex _20_/45   Left Rotation   _20_/90

Range of Motion of the Thoracic Spine: Observed but not measured

| Neurological Level | | DERMATOME | | MYOTOME | | D.T.R | |
|---|---|---|---|---|---|---|---|
| | | right | left | right | left | right | left |
| C5 | | WNL | WNL | right (left) | | 2+ | 2+ |
| C6 | | WNL | WNL | right | (left) (4) | 2+ | 2+ |
| C7 | | WNL | WNL | right 5 | left 5 | right | left |
| C8 | | WNL | WNL | right 5 | left 5 | right | left |

COULD NOT BE TESTED
TO MUCH SHOULDER (P)

Dermatomes; WNL=normal   (+)= hyper sensitive   (–)=hypo sensitive
Myotomes ; 5= normal, 4= mild weakness, 3=significant weakness, 2=can not resist
more than gravity, 0= no sign of contraction Deep Tendon Reflexes; 2= normal, 3=
hyper reflex, 1= diminished reflex, 0=absent

04/07/2010   10:15   KX5050                                      (FAX)2013014701        P.015

_____consultation con't_____

3·25·10

**Orthopedic Tests**

Cervical Distraction    ⊕ Ⓛ  C5·6·7 _____

Cervical Compression    ⊕  Ⓑ Ⓛ Ⓡ _____

Valsalva's Sign    (absent)  present _____

**Postural Analysis**

Head Tilt _____ Ⓑ. _____

(Shoulder height)  Ⓛ _____

Winged Scapula _____ Ⓑ - elevated & medially deviated _____

Iliac Crest Height _____ N/A. _____

Thoracic Kyphosis _____ N/A. _____

Thoracic Scoliosis _____ N/A. _____

Lumbar Lordosis _____ N/A _____

Lumbar Scoliosis _____ N/A. _____


**Comment/ Note**

_____

_____

_____

_____

_____

consultation con't _____

_3-25-10_

## Examination of the Lumbar Spine, Pelvis and Hips

Observation: _____

Palpation: _MILD ACTIVE É INACTIVE TP'S (R) Q.L._
_(R) ILIOPSOAS É TFC._ _____

Gait: _WNL_

Minor's sign _ABSENT_

### Range of Motion of the Lumbar Spine

Forward Flexion _55 /60_  Right Side Flex _15 /20_  right rotation _15 /20_
Extension _25 /35_  Left Side Flex _15 /20_  Left Rotation _15 /20_

| Neurological Level | | | DERMATOME | | MYOTOME | | D.T.R | |
|---|---|---|---|---|---|---|---|---|
| L 3 | | | right _WNL_ | left _WNL_ | right _5_ | left _5_ | right | left |
| L 4 | | | right _WNL_ | left _WNL_ | right _5_ | left _5_ | right | left |
| L 5 | | | right _WNL_ | left _WNL_ | right _5_ | left _5_ | right _+2_ | left _+2_ |
| S 1 | | | right _WNL_ | left _WNL_ | right _5_ | left _5_ | right _+2_ | left _+2_ |

Dermatomes; WNL=normal   (+)= hyper sensitive   (-)=hypo sensitive
Myotomes  ; 5= normal, 4= mild weakness, 3=significant weakness, 2=can not resist
more than gravity, 0= no sign of contraction
Deep Tendon Reflexes; 2= normal, 3= hyper reflex, 1= diminished reflex, 0=absent

04/07/2010   10:16  KX5050                              P.017

_____ consultation con't ____ 3-25-1°

## Range of Motion of the Hips

Right Hip

Flexion    120/120        Abduction  5°/50    Adduction  3°/30
Extension  10/15    External rotation  60/60    Internal Rotation  20 /40

Left Hip

Flexion    120/120        Abduction  50/50    Adduction  3°/30
Extension  1°/15  External rotation  60/60   Internal Rotation  0 /40

## Orthopedic Tests

## Straight Leg Raising

Right Leg Painful arc at:

    0-35 degrees = slack in sciatic arborization; no dural movement

    35-70 degrees = Probable joint pain
    Bilateral straight leg raising painful = sacroiliac pathology

    70-90 degrees = sciatic root tension over intervertebral disc
                          R Pelvis
    Contra-lateral SLR  (-)

    Dorsiflexion of foot  (-)

Left Leg Painful arc at:      L Pelvis

    0-35 degrees = slack in sciatic arborization; no dural movement

    35-70 degrees = Probable joint pain
    Bilateral straight leg raising painful = sacroiliac pathology

    70-90 degrees = = sciatic root tension over intervertebral disc

    Contra-lateral SLR  (-)

    Dorsiflexion of foot  (-)

04/07/2010   10:17   KX5050                          (FAX)                          P.018

consultation con't

3-25-10

**Valsalva's Sign** for nerve root irritation   (Absent)   Present

**Gapping Test** for sprain/strain of the anterior sacroiliac ligament
(-) RT    (-) LT

**Approximation Test** for sprain/ strain of the sacroiliac joint and/or the posterior sacroiliac ligament (-) RT    (-) LT

**Iliac Compression Test** indicating posterior sacroiliac ligament sprain
(-) RT    (-) LT

**Sacroiliac Rocking Test** (-) RT  (-) LT  for posterior sacroiliac joint

(-) RT (-) LT for Iliopsoas pathology

**Trendelenburg's Test** for pelvic instability and muscle weakness
(+) RT    (-) LT   → MILD (+) - DOES NOT ELEVATE

**Gaenslen Test** for SI joint pathology, hip pathology and L4 nerve root irritation.  (-) RT   (-) LT

**Adduction contracture test/Abduction contracture test;**
ASIS angle is = 90 degrees    WNL
ASIS angle is < 90 degrees    contracture of adduction muscles confirmed
ASIS angle is > 90 degrees    contracture of abduction muscles confirmed

**Thomas Test** for hip flexion contraction   (-) RT   (-) LT

**Rectus Femoris Contracture; Ely's Test** (-) RT   (-) LT

**Ober's Test** for contracture of tensor fasciae latae (-) RT   (-) LT

**Hamstring Contracture Test**  (-) RT   (-) LT

**Patrick's Test** for hip pathology   (-) RT   (-) LT

**Patrick's Test** for Iliopsoas contracture   (-) RT   (-) LT

04/07/2010   10:17  KX5050                                    (FAX)2013814701         P.019

_____consultation con':_____

## Examination of the Knee

Observation: _____ Qu TT _____

Palpation: _____

_____ N/A _____

### Range of Motion of the Knees

Right Knee

Flexion _____/135_     Extension _____/15
Medial rotation ____/3o     Lateral Rotation _____/40

Left Knee

Flexion _____/135_     Extension _____/15
Medial rotation _____/3o     Lateral Rotation _____/40

**Valgus Stress Test** for medial instability of the knee: (-) RT   (-) LT

**Varus Stress Test** for lateral instability of the knee: (-) RT   (-) LT

**Lachman's Test** for instability of the anterior cruciate ligament
(-) RT   (-) LT

**Drawer Test** for instability of the posterior cruciate ligament; (-) RT   (-) LT

**McMurray's Test** for medial meniscus pathology            (-) RT   (·) LT

**McMurray's Test** for lateral meniscus pathology            (-) RT   (-) LT

**Apley's Test**   (-) RT   (-) LT _____

04/07/2010   10:17  KX5050                          FAX                              P.020

consultation con't                          3-25-10

## Examination of the Shoulders

**Observation** _____

**Palpation** ® *Supraspinatus* ® *subscapularis* ® *thomboids*
Ⓛ Bic. Tendon _____

## Range of motion of the Shoulders

|  | Right | Left |
|---|---|---|
| Forward Flexion: | active _140_/180  Passive _150_/180 | active _110_/180  Passive _150_/180 |
| Extension: | active _30_/60  Passive _40_/60 | active _20_/60  Passive _30_/60 |
| Abduction: | active _140_/180  Passive _150_/180 | active _120_/180  Passive _150_/180 |
| Adduction: | active _60_/75  Passive _65_/75 | active _60_/75  Passive _65_/75 |
| Internal Rotation: | active _35_/60  Passive _40_/90 | active _30_/60  Passive _35_/60 |
| External Rotation: | active _35_/60  Passive _40_/90 | active _30_/60  Passive _35_/60 |

## Orthopedic Tests

**Yergason's Test for bicipital tendonitis:**       (-) RT   Ⓐ LT

**Drop-Arm Test for rotator cuff pathology**       (-) RT   Ⓐ LT

**Supraspinatus Test**                             Ⓐ RT   Ⓐ LT

**Impingement Sign**                               Ⓐ RT   (-) LT

consultation con't

3-25-10

## Impression

1. ® Shoulder, Adhesive Capsulitis                              726.0
2. ⑬ Shoulder          "              "
3. BICIPITAL TENDONITIS ⓒ Shoulder                              726.10
4. CONTRACTURE ⑬ SHOULDER REGIONS                              718.41
5. S/P ARTHROSCOPIC SURGERY ō FIBROSIS/ANKYLOSIS ⑬         718.5
6. CERVICAL TORTICOLIS ē DISCOGENIC SPONDYLOSIS             847.0
                                                                           722.0
7. Thoracic SPRAIN/STRAIN                                        847.1

### Plan

PATIENT HAS SUFFERED MORE THAN 4 YEARS ē RECURRING
FROZEN SHOULDER 2° TO ADHESIVE CAPSULITIS ē CONTRACTURE.
SHE HAS FAILED SHOULDER SURGERY IN ⑬ SHOULDERS.
HER SHOULDER CONDITION IS COMPLICATED BY DISCOGENIC
SPONDYLOSIS C-SPINE. THE BEST COURSE OF TX FOR HER
NOW IS MANIPULATION UNDER ANESTHESIA X 3 DAYS FOR
HER ⑬ SHOULDER, NECK ē UPPER BACK.
SHE WILL BE SCHEDULED FOR 3-30-10 — 4-1-10.

Rick Lambert MD                    Date   3-25-10

Rick Lambert, MD
M.U.A Specialist

04/07/2010   10:18   KX5050                     S 2 1 CAX0 20138 470Ω 2 9 5      P.022

## Montvale
### Surgical Center
6 Chestnut Ridge Road, Montvale, NJ, 07645
Tel (201) 391-4700

### OPERATIVE REPORT
Day 1 of 3

**Patient Name:** ████████
**Date:** March 30, 2010
**Facility for Procedure: MSC**

**Primary Surgeon: Rick Lambert, MD**
**Assisting Surgeon: Philip Agrios, DC**
**Anesthesia: Michael Reuvini, MD**

**Procedure Performed:**   1. Manipulation Under Anesthesia of the right shoulder
                           2. Manipulation Under Anesthesia of the left shoulder
                           3. Manipulation Under Anesthesia of the cervical spine
                           4. Manipulation Under Anesthesia of the thoracic spine

**Pre-operative Diagnosis:** 1. 726.0    adhesive capsulitis, right shoulder
                                726.10   rotator cuff syndrome
                                718.41   contracture shoulder region
                             2. 726.0    adhesive capsulitis, right shoulder
                                726.10   rotator cuff syndrome
                                718.41   contracture shoulder region
                             3. 847.0    torticollis
                                722.0    cervical discopathy
                             4. 847.1    thoracic sprain/strain
                                7291     myalgia/myospasm

**Post-operative Diagnosis: Same: See progress report for work up**

### Procedure in Detail

Patient was prepared in a pre-operative area with an IV line established for the administration of anesthesia. Having already been supine on a gurney, patient was wheeled into the operating room. Patient was then prepared for monitoring by the anesthesiologist and OR nurse. MAC was induced and the patient was sufficiently sedated to start our procedure.

1

04/07/2010   10:19   KX5050                                    (FAX)201391470            P.023

**Manipulation of the cervical spine;** MUA of the cervical spine was performed for torticollis as well as a nexus to the shoulder region. It was performed sequentially prior to the shoulder to allow maximum release of the muscles associated with both neck and shoulder region. We used the standard approach for MUA of the cervical spine as follows;

The patient was stabilized in the supine position by the assisting doctor. Mild caudal to cephalad traction and passive stretching, laterally and obliquely were done by the primary doctor to break up adhesions and increase range of motion in the cervical spine. The assisting doctor was stabilizing the patient while this procedure was being done. A cervical manipulation was done at C1-C7 spinal levels and cavitations were elicited.

**Manipulation of the Shoulder, right:** The patient was maintained in the supine position. Patient's arm was extended and supported by the primary doctor while the shoulder was passively placed though all ranges of motion noting for limitations and barriers formed by adhesions formed by the rotator cuff. Circumduction of the glenohumereal was performed clockwise then counterclockwise, breaking down labrum adhesions. Next, the shoulder was elevated was flexed to 90 degrees while one hand stabilized the AC joint and the other hand continued to flex the shoulder to maximum range of motion. A steady gradual increase of pressure was applied in flexion breaking down adhesions and allowing the shoulder to reach approximately 140 degrees. Returning the shoulder to approximately 90 degrees of flexion, the shoulder was then gently distracted with one hand while the other hand was contacted over the anterior portion of the glenohumeral joint. An A-P force was thrust gently through the shoulder achieving cavitation. The patient was then turned on his, allowing access to the posterior aspects of the rotator cuff. Extension and internal rotation of the shoulder allowed normal physiological winging of the scapula, giving access to the rhomboid muscles. Grasping the winged scapula, and protracting it broke down adhesions and allowed maximum stretching of the rhomboid muscles and levator scapulae. While still in the lateral position, the shoulder joint was passively put through all ranges of motion noting mild restrictions persisting at approximately 160 degrees of forward flexion. Also noted, were mild restrictions of movement in shoulder extension and internal rotation

**Manipulation of the Shoulder, left:** The patient was maintained in the supine position. Patient's arm was extended and supported by the primary doctor while the shoulder was passively placed though all ranges of motion noting for limitations and barriers formed by adhesions formed by the rotator cuff. Circumduction of the glenohumereal was performed clockwise then counterclockwise, breaking down labrum adhesions. Next, the shoulder was elevated was flexed to 90 degrees while one hand stabilized the AC joint and the other hand continued to flex the shoulder to maximum range of motion. A steady gradual increase of pressure was applied in flexion breaking down adhesions and allowing the shoulder to reach approximately 150 degrees. Returning the shoulder to approximately 90 degrees of flexion, the shoulder was then gently distracted with one hand while the other hand was contacted over the anterior portion of the glenohumeral joint. An A-P force was thrust gently through the shoulder achieving cavitation. The patient was then turned on his, allowing access to the posterior aspects of the rotator cuff. Extension and internal rotation of the shoulder allowed normal physiological winging of

the scapula, giving access to the rhomboid muscles. Grasping the winged scapula, and protracting it broke down adhesions and allowed maximum stretching of the rhomboid muscles and levator scapulae. While still in the lateral position, the shoulder joint was passively put through all ranges of motion noting mild restrictions persisting at approximately 170 degrees of forward flexion. Also noted, were mild restrictions of movement in shoulder extension and internal rotation

**Manipulation of the thoracic spine:** Patient was maintained in the supine position on the operating table. The patient's right arm was grasped by the primary physician, while the primary placed his other hand beneath the patient in the lower, posterior region of the thoracic spine on the right side. While the assisting doctor tractioned the patient's pelvis in a caudal direction causing a passive stretching of the thoracic musculature. This procedure was then repeated on the patient's left side. She was then rolled laterally by the assisting doctor. The primary doctor's cupped fist was placed posterior to the thoracic region. The patient was then placed supine, by the assisting doctor, on the cupped fist of the primary doctor. A mild A-P force was applied and cavitations were elicited. The cupped fist was then moved cephalad along the spinal area applying additional manipulations to the region.

The MUA procedure was concluded at that point. Patient tolerated procedure very well and without incident. At the conclusion of the procedure, the patient was returned to the recovery room where proper monitoring equipment was utilized and was discharged in satisfactory condition as reported in the progress notes.

**Post-Operative Care Day One:**

The patient was advised to spend the remainder of the day relaxing and avoiding any work or exertion. There were no restrictions on diet. Patient was further advised to resume regular regimen of medication prescribed prior to the procedure. Because the patient is returning tomorrow, there will be no eating or drinking after ten p.m this evening.

Rick Lambert, M.D.
Certified: Manipulation Under Anesthesia

3

04/07/2010   10:20   KX5050                    (FAX)2013914701                P.025

# Montvale
## Surgical Center
6 Chestnut Ridge Road Montvale NJ, 07645
Tel (201) 391-4700

### OPERATIVE REPORT
#### Day 2 of 3

**Patient Name:** ▮▮▮▮▮▮
**Date: March 31, 2010**
**Facility for Procedure: MSC**

**Primary Surgeon: Rick Lambert, MD**
**Assisting Surgeon: Philip Agrios, DC**
**Anesthesia: Carlos Frias, MD**

**Procedure Performed:**  1. Manipulation Under Anesthesia of the right shoulder
2. Manipulation Under Anesthesia of the left shoulder
3. Manipulation Under Anesthesia of the cervical spine
4. Manipulation Under Anesthesia of the thoracic spine

**Pre-operative Diagnosis:** 1. 726.0    adhesive capsulitis, right shoulder
726.10    rotator cuff syndrome
718.41    contracture shoulder region
2. 726.0    adhesive capsulitis, right shoulder
726.10    rotator cuff syndrome
718.41    contracture shoulder region
3. 847.0    torticollis
722.6    cervical discopathy
4. 847.1    thoracic sprain/strain
7291    myalgia/myospasm

**Post-operative Diagnosis: Same: See progress report for work up**

### Procedure in Detail

Patient was prepared in a pre-operative area with an IV line established for the administration of anesthesia. Having already been supine on a gurney, patient was wheeled into the operating room. Patient was then prepared for monitoring by the anesthesiologist and OR nurse. MAC was induced and the patient was sufficiently sedated to start our procedure.

1

**Manipulation of the cervical spine;** MUA of the cervical spine was performed for torticollis as well as a nexus to the shoulder region. It was performed sequentially prior to the shoulder to allow maximum release of the muscles associated with both neck and shoulder region. We used the standard approach for MUA of the cervical spine as follows;
The patient was stabilized in the supine position by the assisting doctor. Mild caudal to cephalad traction and passive stretching, laterally and obliquely were done by the primary doctor to break up adhesions and increase range of motion in the cervical spine. The assisting doctor was stabilizing the patient while this procedure was being done. A cervical manipulation was done at C1-C7 spinal levels and cavitations were elicited.

**Manipulation of the Shoulder, right:** The patient was maintained in the supine position. Patient's arm was extended and supported by the primary doctor while the shoulder was passively placed though all ranges of motion noting for limitations and barriers formed by adhesions formed by the rotator cuff. Circumduction of the glenohumereal was performed clockwise then counterclockwise, breaking down labrum adhesions. Next the shoulder was elevated was flexed to 90 degrees while one hand stabilized the AC joint and the other hand continued to flex the shoulder to maximum range of motion. A steady gradual increase of pressure was applied in flexion breaking down adhesions and allowing the shoulder to reach approximately 160 degrees. Returning the shoulder to approximately 90 degrees of flexion, the shoulder was then gently distracted with one hand while the other hand was contacted over the anterior portion of the glenohumeral joint. An A-P force was thrust gently through the shoulder achieving cavitation. The patient was then turned on his, allowing access to the posterior aspects of the rotator cuff. Extension and internal rotation of the shoulder allowed normal physiological winging of the scapula, giving access to the rhomboid muscles. Grasping the winged scapula, and protracting it broke down adhesions and allowed maximum stretching of the rhomboid muscles and levator scapulae. While still in the lateral position. the shoulder joint was passively put through all ranges of motion noting mild restrictions persisting at approximately 175 degrees of forward flexion. Also noted, were mild restrictions of movement in shoulder extension and internal rotation

**Manipulation of the Shoulder, left:** The patient was maintained in the supine position. Patient's arm was extended and supported by the primary doctor while the shoulder was passively placed though all ranges of motion noting for limitations and barriers formed by adhesions formed by the rotator cuff. Circumduction of the glenohumereal was performed clockwise then counterclockwise, breaking down labrum adhesions. Next, the shoulder was elevated was flexed to 90 degrees while one hand stabilized the AC joint and the other hand continued to flex the shoulder to maximum range of motion. A steady gradual increase of pressure was applied in flexion breaking down adhesions and allowing the shoulder to reach approximately 165 degrees. Returning the shoulder to approximately 90 degrees of flexion, the shoulder was then gently distracted with one hand while the other hand was contacted over the anterior portion of the glenohumeral joint. An A-P force was thrust gently through the shoulder achieving cavitation. The patient was then turned on his, allowing access to the posterior aspects of the rotator cuff. Extension and internal rotation of the shoulder allowed normal physiological winging of

2

the scapula, giving access to the rhomboid muscles. Grasping the winged scapula, and protracting it broke down adhesions and allowed maximum stretching of the rhomboid muscles and levator scapulae. While still in the lateral position, the shoulder joint was passively put through all ranges of motion noting mild restrictions persisting at approximately 180 degrees of forward flexion. Also noted, were mild restrictions of movement in shoulder extension and internal rotation

**Manipulation of the thoracic spine:** Patient was maintained in the supine position on the operating table. The patient's right arm was grasped by the primary physician, while the primary placed his other hand beneath the patient in the lower, posterior region of the thoracic spine on the right side. While the assisting doctor tractioned the patient's pelvis in a caudal direction causing a passive stretching of the thoracic musculature. This procedure was then repeated on the patient's left side. She was then rolled laterally by the assisting doctor. The primary doctor's cupped fist was placed posterior to the thoracic region. The patient was then placed supine, by the assisting doctor, on the cupped fist of the primary doctor. A mild A-P force was applied and cavitations were elicited. The cupped fist was then moved cephalad along the spinal area applying additional manipulations to the region.

The MUA procedure was concluded at that point. Patient tolerated procedure very well and without incident. At the conclusion of the procedure, the patient was returned to the recovery room where proper monitoring equipment was utilized and was discharged in satisfactory condition as reported in the progress notes.

**Post-Operative Care Day Two :**

The patient was advised to spend the remainder of the day relaxing and avoiding any work or exertion. There were no restrictions on diet. Patient was further advised to resume regular regimen of medication prescribed prior to the procedure. Because the patient is returning tomorrow, there will be no eating or drinking after ten p.m this evening.

Rick Lambert, M.D.
Certified: Manipulation Under Anesthesia

3

# Montvale
## Surgical Center
6 Chestnut Ridge Road Montvale NJ 07645
Tel (201) 391-4700

OPERATIVE REPORT
Day 3 of 3

**Patient Name:** ████████

**Date: April 1, 2010**

**Facility for Procedure: MSC**

**Primary Surgeon: Rick Lambert, MD**

**Assisting Surgeon: Philip Agrios, DC**

**Anesthesia: Michael Reuvini, MD**

**Procedure Performed:**   1. Manipulation Under Anesthesia of the right shoulder
    2. Manipulation Under Anesthesia of the left shoulder
    3. Manipulation Under Anesthesia of the cervical spine
    4. Manipulation Under Anesthesia of the thoracic spine

**Pre-operative Diagnosis:** 1. 726.0    adhesive capsulitis, right shoulder
                726.10    rotator cuff syndrome
                718.41    contracture shoulder region
            2. 726.0    adhesive capsulitis, right shoulder
                726.10    rotator cuff syndrome
                718.41    contracture shoulder region
            3. 847.0    torticollis
                722.0    cervical discopathy
            4. 847.1    thoracic sprain/strain
                7291    myalgia/myospasm

**Post-operative Diagnosis: Same: See progress report for work up**

**Procedure in Detail**

Patient was prepared in a pre-operative area with an IV line established for the administration of anesthesia. Having already been supine on a gurney, patient was wheeled into the operating room. Patient was then prepared for monitoring by the anesthesiologist and OR nurse. MAC was induced and the patient was sufficiently sedated to start our procedure.

**Manipulation of the cervical spine;** MUA of the cervical spine was performed for torticollis as well as a nexus to the shoulder region. It was performed sequentially prior to the shoulder to allow maximum release of the muscles associated with both neck and shoulder region. We used the standard approach for MUA of the cervical spine as follows;

The patient was stabilized in the supine position by the assisting doctor. Mild caudal to cephalad traction and passive stretching, laterally and obliquely were done by the primary doctor to break up adhesions and increase range of motion in the cervical spine. The assisting doctor was stabilizing the patient while this procedure was being done. A cervical manipulation was done at C1-C7 spinal levels and cavitations were elicited.

**Manipulation of the Shoulder, right:** The patient was maintained in the supine position. Patient's arm was extended and supported by the primary doctor while the shoulder was passively placed though all ranges of motion noting for limitations and barriers formed by adhesions formed by the rotator cuff. Circumduction of the glenohumeral was performed clockwise then counterclockwise, breaking down labrum adhesions. Next the shoulder was elevated was flexed to 90 degrees while one hand stabilized the AC joint and the other hand continued to flex the shoulder to maximum range of motion. A steady gradual increase of pressure was applied in flexion breaking down adhesions and allowing the shoulder to reach approximately 175 degrees. Returning the shoulder to approximately 90 degrees of flexion, the shoulder was then gently distracted with one hand while the other hand was contacted over the anterior portion of the glenohumeral joint. An A-P force was thrust gently through the shoulder achieving cavitation. The patient was then turned on his, allowing access to the posterior aspects of the rotator cuff. Extension and internal rotation of the shoulder allowed normal physiological winging of the scapula, giving access to the rhomboid muscles. Grasping the winged scapula, and protracting it broke down adhesions and allowed maximum stretching of the rhomboid muscles and levator scapulae. While still in the lateral position, the shoulder joint was passively put through all ranges of motion noting mild restrictions persisting at approximately 180 degrees of forward flexion. Also noted, were mild restrictions of movement in shoulder extension and internal rotation

**Manipulation of the Shoulder, left:** The patient was maintained in the supine position. Patient's arm was extended and supported by the primary doctor while the shoulder was passively placed though all ranges of motion noting for limitations and barriers formed by adhesions formed by the rotator cuff. Circumduction of the glenohumeral was performed clockwise then counterclockwise, breaking down labrum adhesions. Next the shoulder was elevated was flexed to 90 degrees while one hand stabilized the AC joint and the other hand continued to flex the shoulder to maximum range of motion. A steady gradual increase of pressure was applied in flexion breaking down adhesions and allowing the shoulder to reach approximately 175 degrees. Returning the shoulder to approximately 90 degrees of flexion, the shoulder was then gently distracted with one hand while the other hand was contacted over the anterior portion of the glenohumeral joint. An A-P force was thrust gently through the shoulder achieving cavitation. The patient was then turned on his, allowing access to the posterior aspects of the rotator cuff. Extension and internal rotation of the shoulder allowed normal physiological winging of

the scapula, giving access to the rhomboid muscles. Grasping the winged scapula, and protracting it broke down adhesions and allowed maximum stretching of the rhomboid muscles and levator scapulae. While still in the lateral position, the shoulder joint was passively put through all ranges of motion noting mild restrictions persisting at approximately 180 degrees of forward flexion. Also noted, were mild restrictions of movement in shoulder extension and internal rotation

**Manipulation of the thoracic spine:** Patient was maintained in the supine position on the operating table. The patient's right arm was grasped by the primary physician, while the primary placed his other hand beneath the patient n the lower, posterior region of the thoracic spine on the right side. While the assisting doctor tractioned the patient's pelvis in a caudal direction causing a passive stretching of the thoracic musculature. This procedure was then repeated on the patient's left side. She was then rolled laterally by the assisting doctor. The primary doctor's cupped fist was placed posterior to the thoracic region. The patient was then placed supine, by the assisting doctor, on the cupped fist of the primary doctor. A mild A-P force was applied and cavitations were elicited. The cupped fist was then moved cephalad along the spinal area applying additional manipulations to the region.

The MUA procedure was concluded at that point. Patient tolerated procedure very well and without incident. At the conclusion of the procedure, the patient was returned to the recovery room where proper monitoring equipment was utilized and was discharged in satisfactory condition as reported in the progress notes.

### Post-Operative Care Day Three:

The patient was advised to spend the remainder of the day relaxing and avoiding any work or exertion. There were no restrictions on diet. Patient was further advised to resume regular regimen of medication prescribed prior to the procedure.

Rick Lambert, M.D.
Certified: Manipulation Under Anesthesia

621028 100295

**RECEIVED**
**HORIZON BCBSNJ-OSC**

**JAN 28 2011**

**CERTIFIED MAIL**